**ACKERMAN BUICK, INC., Appellant,**

v.

**GENERAL MOTORS CORPORATION,**
Respondent.

No. ED 79477.

Missouri Court of Appeals,
Eastern District,
Division Five.

Nov. 13, 2001.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Jan. 10, 2002.

Charles A. Seigel, H. Kent Munson, The Stolar Partnership, St. Louis, MO, Attorneys for Appellant.

David M. Harris, Greensfelder, Hemker & Gale, P.C., St. Louis, MO, Jeffrey J. Jones, Jones, Day, Reavis & Pogue, Columbus, OH, Attorneys for Respondent.

PAUL J. SIMON, Judge.

Ackerman Buick, Inc. (plaintiff) appeals the judgment of the St. Louis County Circuit Court, entered in favor of General Motors Corporation (defendant) on its motion for summary judgment.

On appeal, plaintiff contends that the trial court erred in granting defendant's motion for summary judgment on its breach of contract claim because: (1) the alleged oral agreement met the requisite elements of a contract in that it was entered into between competent parties, was of proper subject matter, was supported by consideration, and contained mutuality of agreement; (2) the application to become a Pontiac dealer signed by Jerry Ackerman (Ackerman), the president and owner of plaintiff, did not preclude plaintiff's claim because the parole evidence rule did not apply to the application as it was not a fully integrated contract, was no more than a formality, and could not affect the preexisting agreement; (3) the preexisting dealership agreement did not bar plaintiff's claim because parties to a contract cannot preclude themselves from entering into subsequent oral agreements; and (4) the statute of frauds did not bar plaintiff's claim because the standard dealership agreement which plaintiff was to receive would expire by its terms upon the death or incapacity of Ackerman thereby removing the agreement from the statute of frauds, and the standard dealership agreement by its terms, could be terminated upon 60 days' written notice, thereby removing it from the statute of frauds. Plaintiff further argues that the trial court erred in granting defendant's motion for summary judgment on plaintiff's Motor Vehicle Franchise Practices Act (MVFPA) claim on the same grounds as the claim for breach of contract because the MVFPA claim is not dependent upon an enforceable contract between plaintiff and defendant. We affirm.

When considering an appeal from an entry of summary judgment, we review the record in the light most favorable to the non-movant. *Hubbard v. Lincoln Cty. R–III School Dist.*, 23 S.W.3d 762, 763 (Mo.App. E.D.2000). Our review is essentially *de novo*. *Id*. "The criteria on appeal for testing the propriety of summary judgment are no different from those which should be employed by the trial court to determine the propriety of sustaining the motion initially." *Id*. "The propriety of summary judgment is purely an issue of law." *Id*.

The movant's burden on its motion for summary judgment is to show a

right to judgment flowing from facts about which there is no genuine dispute. *Id.* The movant may establish its right to summary judgment by showing: (1) facts that negate any one of the non-movant's elements facts; (2) that the non-movant has not been able to produce and will not be able to produce evidence sufficient to allow the trier of fact to find the existence of any one of the non-movant's elements; or (3) that there is no genuine dispute as to the existence of facts necessary to support the movant's properly pleaded affirmative defense. *Id.*

■■■ The non-movant must show by affidavit, depositions, answers to interrogatories, or admissions on file, that one or more material facts shown by the movant to be beyond any genuine dispute is, in fact, genuinely disputed. *Id.* at 763, 764. A "genuine issue" is a real, non-frivolous dispute, that exists ". . . . where the record contains competent materials that evidence two plausible, but contradictory, accounts of the essential facts." *Id.* at 764. A "genuine issue" is a dispute that is real and not merely argumentative, imaginary or frivolous. *Id.*

■■■ We will sustain the trial court's granting of summary judgment if it is sustainable on any theory as a matter of law. *Preston v. Preston*, 823 S.W.2d 48, 49 (Mo.App. E.D.1991).

The record in the light most favorable to plaintiff, the non-movant, reveals that Ackerman has been the president and sole owner of plaintiff since 1964. Defendant is a manufacturer of various vehicle lines including Buick, Pontiac, Oldsmobile, and GMC Truck. At the time of the purported oral contract, plaintiff, as a corporation, had a five-year Buick Dealer Sales and Service Agreement with defendant providing in pertinent part:

> If Dealer wants to make any change in location(s) or Premises, or in the uses previously approved for those Premises, Dealer will give Division written notice of the proposed change, together with the reasons for the proposal, for Division's evaluation and final decision in light of dealer network planning considerations. No change in location or in the use of Premises, including addition of any other vehicle lines, will be made without Division's prior written authorization.

The agreement also expressly provided:

> No agreement between Division and Dealer which relates to matters covered herein, and no change in, addition to (except the filling in of blank lines) or erasure of any printed portion of this Agreement, will be binding unless permitted under the terms of this Agreement or related documents, or approved in a written agreement executed as set forth in Division's Dealer Sales and Service Agreement.

In the early 1990s, plaintiff informed defendant that it desired to obtain additional vehicle lines. Plaintiff and defendant learned that Grant Davis (Davis), a St. Louis Pontiac, Oldsmobile and GMC Truck dealer, wished to sell one or more of his three vehicle lines. Plaintiff commenced negotiations with Davis at the encouragement of defendant. After being informed by Edward Roggenkamp (Roggenkamp), General Motors Executive Director of Dealer Development, that Davis was dealing with Morton Mallory (Mallory), a local dealer, with respect to the sale of the Davis GMC Truck line, plaintiff became interested in the remaining Davis Pontiac and Oldsmobile lines.

On January 20, 1994, Davis came to a verbal agreement with Mallory to sell Mallory the GMC Truck line and on February 3, 1994, signed a contract to that effect.

Plaintiff offered Davis $1.5 million for the Oldsmobile and Pontiac franchises, inventory of special tools, and other assets. On February 17, 1994, Davis' attorney sent a draft "buy/sell" agreement to plaintiff. Ackerman did not sign it because he disagreed with several of its provisions, especially a requirement that plaintiff give a $100,000 nonrefundable deposit to Davis. Thereafter, negotiations became strained and the parties failed to reach a final agreement.

In early March 1994, representatives of defendant met with representatives of plaintiff and informed them that defendant was in favor of plaintiff's having the Davis franchise.

On March 17, 1994, Roggenkamp and defendant's General Director of Dealer Network Development, Bruce Edwards (Edwards), met with Ackerman and plaintiff's General Sales Manager Gary Jacobs (Jacobs) to discuss transferring the Davis Pontiac franchise to plaintiff. Jacobs asked defendant's representatives why Pontiac representatives were not present at the meeting. Roggenkamp responded that "Pontiac was already in the fold, they didn't even need to be part of the meeting." Ackerman informed the representatives about the Davis negotiations and that Davis "wasn't coming off the price." He added that he would "consider" an offer from Davis if he lowered the price. Roggenkamp responded: "Jerry, hands off as of this moment. I'm going to go over to Grant Davis this afternoon." The representatives told Ackerman that they would "handle everything" and "Get [the Pontiac franchise] bought." Roggenkamp told Ackerman to cease negotiations with Davis and further that defendant would deliver the Pontiac franchise and provide $185,000 in funding for improvements.

Plaintiff ceased communication with Davis, understanding that defendant would negotiate a price between Davis and plaintiff.

On March 23, 1994, Davis received a letter from the GMC Truck zone manager informing him that defendant would not approve the deal between Davis and Mallory.

At about that time, Edwards contacted Jacobs and informed him: "It looks like we have this worked out. I would like to come by tomorrow afternoon and see [Ackerman]." The next day, Edwards went to plaintiff. He told Jacobs that he ". . . . had it worked out with Davis." According to Jacobs, Edwards stated at the brief meeting that followed:

I have met with [Davis], it's a done deal. It's going to cost you [$700,000] just like we said and if you are willing to go that we can put this deal together. And [Ackerman] said well, you know, that's really a little more than I wanted to go but if that's what it's going to take let's get it done. And [Edwards] said, okay, I'm heading back to Detroit and we will get the ball rolling.

The $700,000 was for the right to operate a Pontiac franchise ("Blue Sky"). It was Ackerman's understanding that this right would be pursuant to a "standard five-year Pontiac agreement." If plaintiff wanted or needed any other assets, it could negotiate for them separately.

Subsequently plaintiff "prepared to operate a Pontiac franchise" and arranged financing while at the same time being assured by defendant that the transaction was a "go deal."

Meanwhile, Davis' attorney prepared a complaint regarding defendant's refusal to approve his deal with Mallory. In early May, Davis came to an agreement with defendant in which defendant would allow Davis to sell the GMC Truck line to Mallory. As part of the agreement, defendant

was to purchase the Pontiac and Oldsmobile lines from Davis. The deal was to close in early August, 1994.

In late May, Pontiac Zone Manager Lawrence Walter (Walter) informed Ackerman that he had to fill out an Application for a General Motors Corporation Dealer Sales and Service Agreement (application). Ackerman and his Controller, Mr. Aaron Kahle, were told that the deal had already been approved and that the application was a "formality." Ackerman was also told that the Buick division, and not the Pontiac division, controlled and had already approved the decision. Ackerman read, signed, and submitted the application on May 17, 1994.

In the upper left-hand corner of the agreement were the logos of Pontiac and General Motors, and underneath the heading:

### PONTIAC MOTOR DIVISION

General Motors Corporation

The application stated, in pertinent part:

Acting on my behalf or on behalf of such partnership or corporation as I may later propose, I hereby apply for a General Motors Corporation Dealer Sales and Service Agreement (Dealer Agreement) for motor vehicles marketed by the Division of General Motors Corporation identified above.

\* \* \*

In making this Application, I acknowledge and agree that:

The forms for this Application and Questionnaire were supplied to me by Division as a convenience to me and their receipt by Division for consideration shall be without any obligation whatsoever on the part of Division or any of its representatives.

(2) No one other than the GENERAL MANAGER, GENERAL SALES MANAGER, SALES MANAGER OR ASSISTANT GENERAL SALES MANAGER Division has the authority to approve any proposal that may be subsequently submitted in support of this Application for a Dealer Agreement. Such approval, if given, will be only in the form of either: (a) a written Dealer Agreement executed on behalf of Division and the part named as "Dealer" in the introductory paragraph thereof, or (b) a written "Letter of Intent" to execute a Dealer Agreement executed on behalf of the Division by either the GENERAL MANAGER, GENERAL SALES MANAGER, SALES MANAGER, ASSISTANT GENERAL SALES MANAGER, REGIONAL OR ZONE MANAGER and accepted by me. Any action taken, expenditures made, or commitments assumed, by me, by anyone to be associated with me in the proposed dealer company, or by the proposed dealer company itself, prior to receipt by me of such written Dealer Agreement shall be at my or their sole risk and responsibility without any liability or obligation whatsoever on the part of Division or any of its representatives.

(3) Neither I nor the dealer company which I may propose will be entitled to rely upon any representation or statement indicating approval of this application made to me or anyone else by any representative or employe of Division or any other person whatsoever prior to receipt of a Dealer Agreement or an appropriate "Letter of Intent" executed by Division.

Following Ackerman's submission of the application, Walter requested additional information which Ackerman subsequently provided. Ackerman had completed applications in the past related to proposed

Cadillac, Kia, Honda, and Hyundai transactions. However, no such application was required when he acquired a Toyota franchise in South St. Louis.

Late in July, Ackerman was visited by representatives of defendant who informed him that defendant planned to close its deal with Davis and, the next day, close its deal with plaintiff, thus transferring the Pontiac franchise to plaintiff.

The deal between Davis and defendant closed on August 1, 1994. Plaintiff and Buick representatives appeared for the closing of the deal between plaintiff and defendant. Ackerman was prepared to write a $700,000 check for the franchise, although he was not sure to whom the check would be written. However, defendant failed to show for the closing.

Although Walter did not contact plaintiff on the closing date, he later talked to Ackerman and told him that Pontiac was still considering various matters and that he would send Ackerman a letter when he completed his review. During this time, defendant and its representatives, especially those from Buick, told Ackerman that the "deal was still on."

On September 9, 1994, Walter sent a letter to plaintiff informing it that Pontiac had completed its review of plaintiff's application and determined that:

> ....Pontiac representation is not required at the 2900 Pershall Road location and that at this time, our customer representation needs, can be serviced by the existing Pontiac dealers in the area.

Walter did not recall doing a study of market data to determine whether another Pontiac location was needed and no document evidences such a study.

Had plaintiff acquired the Pontiac franchise, it would have been in competition with Behlman Pontiac (Behlman), which is located on the same interstate as the Ack-

erman Buick facility. Behlman strenuously objected to the acquisition.

On September 1, 1999, David L. Thompson (Thompson), defendant's Market Area Manager, sent a letter to Ackerman in response to a letter from attorney Charles Seigel (Seigel). The Seigel letter does not appear in the record. The letter from Thompson states, in pertinent part:

> This letter is in response to [Seigel's] letters dated August 5th and August 9th 1999 concerning your claims over the possible addition of Pontiac and GMC to your Buick dealership operations.

> \* \* \*

> Defendant is willing to grant a limited tolling upon the following terms and conditions:

> 1. The statute of limitations for any claims that would expire on September 9, 1999 are tolled for a thirty day period, until October 9, 1999.

> \* \* \*

On September 22, 1999, another letter was sent from Thompson to plaintiff tolling the statute of limitations an additional 30 days.

On November 6, 1999, following defendant's agreement to toll the statute of limitations to November 9, 1999, plaintiff filed a petition alleging breach of an oral contract in Count I and violation of the Motor Vehicle Franchise Practices Act (MVFPA) in Count II and requesting damages including but not limited to lost profits, costs, and expenses on both counts. Defendant filed a Motion to Dismiss which was denied.

On February 1, 2001, defendant filed a motion for summary judgment alleging that: (1) Ackerman signed a written application with defendant that expressly repudiated prior oral agreements; (2) the plain terms of plaintiff's Dealer Sales and Ser-

vice Agreement with defendant expressly barred "oral" authorization for plaintiff's sales and service of other line-makes like Pontiac; (3) plaintiff did not have an enforceable oral contract with defendant because the agreement alleged by plaintiff was no more than a purported "agreement to later try to agree," a claim not recognized by Missouri courts; (4) the Statute of Frauds barred an "oral contract" to enter into a five-year dealer agreement; and (5) plaintiff's claims were barred by the statute of limitations. Defendant further alleged that Plaintiff's MVFPA claim failed as a matter of law "on all the foregoing grounds in addition to other grounds as well." Defendant argued that plaintiff's MVFPA claim failed as it did not have the requisite standing to bring such a claim. In support of its motion, defendant filed two copies of Buick Motor Division Dealer Sales and Service Agreements dated November 1, 1990 and November 1, 1995; portions of the depositions of Ackerman, Jacobs, Davis' Chief Financial Officer Stuart Lee Ray, Craig Smith, Ackerman employee Geraldine Pavlovitz, John S. Naughton, Kahle, Walter, Edwards, and Roggenkamp along with corresponding exhibits; plaintiff's Supplemental Answers to [Defendant's] First Set of Interrogatories to Plaintiff; the September 1, 1999 and September 22, 1999 letters from Thompson to plaintiff tolling the statute of limitations; and a copy of *Stone v. General Motors Corp.*, No. 4:99CV01273, Memorandum & Order.

Thereafter, plaintiff filed a response and a Statement of Additional Undisputed Facts to defendant's motion for summary judgment. In support of its response, plaintiff filed the affidavits of Ackerman and H. Kent Munson, attorney for plaintiff; the depositions of Ackerman, Jacobs, Walter, Ray, Kahle, Roggenkamp, Naughton, and Edwards; the September 22, 1999 letter from Thomas extending the Statute

of Limitations; copies of financial assistance requests produced by defendant, various documents of defendant, and a copy of a June 2, 1994 internal memorandum of defendant; copies of several exhibits; a copy of a September 23, 1994 Edwards letter; a copy of the September 9, 1994 letter from Walter; and a copy of the November 1, 1990 Dealer Sales and Service Agreement between plaintiff and defendant.

With leave, defendant filed its response to plaintiff's Additional Statement of Undisputed Facts along with copies of *Owens v. Subaru of America, Inc.*, 802 F.2d 459, 1986 WL 17476 (6th Cir.1986) and *Hall v. Ford Motor Company*, 68 F.3d 474, 1995 WL 619972 (6th Cir.1995); a letter from David M. Harris, attorney for defendant, to Kent Munson dated February 27, 2001; the expert report of Ernest Manuel, Jr., Ph.D.; and excerpts of the depositions of Edwards and Smith.

On April 27, 2001, defendant filed a motion to present stipulation of certain facts. The same day, the trial court sustained defendant's motion for summary judgment on both counts "....for the reason that the alleged oral agreement set forth in Count I of plaintiff's Amended Petition fails to meet the requisite elements of a contract; plaintiff's cause of action set forth in Count I of Plaintiff's Amended Petition is barred by the terms of the subsequent application agreement executed by plaintiff; and plaintiff's prior dealership agreement; and plaintiff's claim in Count I is barred by the statute of frauds." The trial court awarded court costs against plaintiff and did not make findings of fact or conclusions of law.

In its first point on appeal, plaintiff contends that the trial court erred in granting defendant's motion for summary judgment with respect to plaintiff's breach of con-

tract claim on grounds that the oral agreement did not meet the requisite elements of an enforceable contract, for the reasons that the oral contract was entered into between competent parties, was of proper subject matter, supported by consideration, and was an agreement containing mutuality of agreement and obligation. In its fourth point on appeal, plaintiff argues the trial court erred in granting defendant's motion for summary judgment on its breach of contract claim because the statute of frauds did not bar the claim in that the standard dealership agreement which plaintiff was to receive would expire by its terms upon the death or incapacity of Ackerman and the standard dealership agreement by its terms, could be terminated upon 60 days' written notice. If the oral contract for the sale of the Davis Pontiac franchise is unenforceable because of the statute of frauds, then the issue of whether the oral contract was made or not would not have precluded entry of summary judgment for defendant. *Howard Construction Co. v. Jeff–Cole Quarries, Inc.,* 669 S.W.2d 221, 226 (Mo.App. W.D. 1983).

Therefore, we shall address plaintiff's fourth point on appeal. As an affirmative defense in its answer, defendant stated that plaintiff's claims were barred by the statute of frauds because, "among other things, [p]laintiff claims that [defendant] had an oral 'contract' to transfer a dealership and/or automobile line." Although the trial court found that plaintiff's breach of contract claim was barred by the statute of frauds, defendant's motion was directed to Section 432.010 RSMo (2001) (all further references herein shall be to RSMo 2001 unless otherwise indicated), which provides, in pertinent part, that "no action shall be brought . . . . to charge any person . . . . upon any agreement that is not to be performed within one year from the making thereof." However, defendant in its brief argues that, in addition to being precluded by Section 432.010, plaintiff's breach of contract claim is barred by Uniform Commercial Code (UCC) Section 400.1–206(1) (Section 206), which provides:

(1) Except in the cases described in subsection (2) of this section *a contract for the sale of personal property is not enforceable by way of action or defense beyond five thousand dollars in amount or value of remedy unless there is some writing* which indicates that a contract for sale has been made between the parties at a defined or stated price, reasonably identifies the subject matter, and is signed by the party against whom enforcement is sought or by his authorized agent.

(2) Subsection (1) of this section does not apply to contracts for the sale of goods (section 400.2–201) nor of securities (section 400.8–113) nor to security agreements (section 400.9–203).

[Emphasis added.]

The Comment to Section 206 provides:

Purposes: *To fill the gap left by the Statute of Frauds provisions for goods (Section 2–201),* securities (Section 8–319), and security interests (Section 9–203). The Uniform Sales Act covered the sale of "choses in action"; the *principal gap relates to sale of the "general intangibles" defined in Article 9 (Section 9–106)* and to transactions excluded from Article 9 by Section 9–104. Typical are the sale of bilateral contracts, royalty rights or the like.

[Emphasis added.]

Plaintiff did not address the application of Section 206 in its reply brief. We will affirm the trial court's granting of summary judgment ". . . . even if we do not accept the trial court's reasoning if the judgment can, as a matter of law, be sustained on any theory." *Guy v. City of St.*

*Louis,* 829 S.W.2d 66, 69 (Mo.App.1992). The trial court's entry of summary judgment will be sustained even if the theory on which we dispose of the case was not presented to the trial court. *Id.*

The alleged oral contract between plaintiff and defendant was for the sale of a franchise without assets. Although we find no definition of franchise in the UCC, the term is defined in Section 407.815 of the MVFPA, which provides, in pertinent part:

\* \* \*

(4) "Franchise", a written arrangement or contract for a definite or indefinite period, in which a person grants to another person a license to use, or the right to grant to others a license to use, a trade name, trademark, service mark, or related characteristics, in which there is a community of interest in the marketing of goods or services, or both, at wholesale or retail, by agreement, lease or otherwise, and in which the operation of the franchisee's business with respect to such franchise is substantially reliant on the franchisor for the continued supply of franchised new motor vehicles, parts and accessories for sale at wholesale or retail.

Section 206 applies to contracts "for the sale of personal property" except in the cases described in subsection (2), namely contracts for the sale of goods, securities, or security agreements. Clearly, a franchise does not fall into any of these categories as defined in Sections 400.2–105(1), 400.8–102(1), 400.9–105(1).

Further, the comment to Section 206(1) provides that the principal gap filled by that section relates to the sale of "general intangibles" defined in UCC Section 400.9–106 (Article 9) and to transactions excluded from Article 9 by Section 400.9–104.

Section 400.9–106 defines "general intangibles" as ". . . . any personal property (including things in action) other than goods, accounts, chattel paper, documents, investment property, instruments, rights to proceeds of written letters of credit, and money." In the Comment to Section 400.9–106, "general intangibles" include miscellaneous types of contract rights and other types of personal property which are used as commercial security. Examples include copyrights, trademarks, and patents, except to the extent that they are excluded under Section 400.9–104(a).

Section 400.9–104 lists transactions that are excluded from Article 9. These transactions basically include security interests, landlords' liens, transfers of claims for compensation, transfers by governmental divisions, sales of accounts or chattel paper, insurance policy interests, rights of setoff, transfer of tort claims, and transfers of deposit account interests.

Thus, Section 206(1) applies to contracts for the sale of personal property, examples of which are contracts for the sale of "general intangibles," "bilateral contracts," "royalty rights or the like," "goodwill," "literary rights," "rights to performance," "copyrights," "trademarks," and "patents." The list is not exhaustive. Clearly, a contract for the sale of a franchise would be includable as a general intangible and is compatible with the properties listed. Therefore, the language and stated purpose of Section 206 apply to a contract for the sale of a franchise.

Other jurisdictions have similarly held statutory provisions analogous to Section 206(1) apply to the sale of businesses, partnership interests, and copyrights. See Dale Joseph Gilsinger, J.D., *Construction and Application of Statute–of–Frauds Provision Under UCC Section 1–206 Governing Personal Property Not Otherwise Covered,* 62 A.L.R.5th 137 (1998) (annota-

tion). See also *Beldengreen v. Ashinsky,* 139 Misc.2d 766, 528 N.Y.S.2d 744, 747 (N.Y.City Civ.Ct.1987) (statute analogous to Section 206(1) applies to the sale of a business); *Pyle v. Wolf Corporation,* 354 F.Supp. 346, 358 (1972) (statute analogous to Section 206(1) applies to the sale of a limited partnership interest); *Grappo v. Alitalia Linee Aeree Italiane, S.p.A.,* 56 F.3d 427, 431 (C.A.2 (N.Y.) 1995) and *Mellencamp v. Riva Music Ltd.,* 698 F.Supp. 1154, 1163 (S.D.N.Y.1988) (statutes analogous to Section 206(1) apply to the sale of copyrights).

Although we have not found nor been directed to a Missouri case addressing the issue of whether a franchise is personal property within the meaning of Section 206(1), our Supreme Court's discussion in *Norris v. Norris,* 731 S.W.2d 844, 845 (Mo. banc 1987), although in the context of an action construing a will, is instructive. In *Norris,* our Supreme Court concluded:

> Personal property can be either tangible or intangible. Tangible personal property is property which may be felt or touched; such property as may be seen, weighed, measured, and estimated by the physical senses. Conversely, *intangible personal property* is that which has no intrinsic and marketable value, but is merely the representative or evidence of value, *such as* certificates of stock, bonds, promissory notes and *franchises.*

[Emphasis added.]

Here, plaintiff's action is based upon an oral contract for the sale of a franchise with a value well in excess of the $5,000 limit imposed by Section 206. Since we have found that a franchise is "personal property" subject to Section 206(1), the contract, if established, would be unenforceable as a matter of law. Since our determination is dispositive of plaintiff's

fourth point, it is not necessary to address plaintiff's second and third points.

In its fifth and final point on appeal, plaintiff argues that the trial court erred in granting defendant's motion for summary judgment on plaintiff's MVFPA claim. Sections 407.810–407.835. The trial court held that plaintiff's MVFPA claim failed on the same grounds as the breach of contract claim.

In Count II of its amended petition, plaintiff restated, realleged, and incorporated by reference the averments of its breach of contract claim. Plaintiff further alleged:

17. At all times mentioned herein, [plaintiff] was and is a "Franchisee" within the meaning of the [MVFPA], as that term is defined in Section 407.815(5) of the Act and [defendant] was and is a "Franchisor," as that term is defined in Section 407.815(6) of the Act. The dealership arrangement between [plaintiff] and [defendant] is a "Franchise" within the meaning of that Act, as that term is defined in Section 407.815(4) of the Act.

18. Section 407.825.1(1) of the Act provides that it is unlawful for a Motor Vehicle Franchisor, such as [defendant], to "engage in any conduct which is capricious, in bad faith, or unconscionable and which causes damage to a motor vehicle franchisee or to the public."

Plaintiff next argued that the actions of defendant were capricious, in bad faith, and unconscionable in violation of Section 407.825.1(1).

The MVFPA defines "franchisee" as a " . . . .person to whom a franchise is granted," and "franchisor" as a " . . . .person who grants a franchise to another person." Sections 407.815(5) and (6). As discussed earlier, the alleged oral contract was for the sale or transfer of the Davis Pontiac franchise without assets. The MVFPA provides:

1. Notwithstanding the terms of any franchise agreement, *the performance,* whether by act or omission, *by a motor vehicle franchisor* of any or all of the following acts enumerated in this subsection are hereby defined as unlawful practices, the remedies for which are set forth in section 407.835:

(1) To engage in any *conduct* which is capricious, in bad faith, or unconscionable and *which causes damage to a motor vehicle franchisee or to the public;* provided, that good faith conduct engaged in by motor vehicle franchisors as sellers of new motor vehicles or part or as holders of security interest therein, in pursuit of rights or remedies accorded to sellers of goods or to holders of security interests pursuant to the provisions of chapter 400, RSMo, uniform commercial code, shall not constitute unfair practices pursuant to sections 407.810 to 407.835.

Section 407.825.1(1).

[Emphasis added.]

■■■ At the time of the alleged incidents, plaintiff was a "franchisee" with respect to the Buick line in that it was a corporation to which a Buick franchise had been granted. Defendant was a "franchisor" of plaintiff in that it was the corporation which granted the Buick franchise to plaintiff. However, although a prospective Pontiac franchisee, plaintiff was not a franchisee with respect to the Pontiac line as the term is used in the MVFPA as the Pontiac franchise had not been transferred to plaintiff at the time of the alleged incidents.

■■■ "The primary rule of statutory construction is to ascertain the lawmaker's intent from the language used and give effect to that intent, while considering the words used in their plain and ordinary meaning." *Lincoln County Stone Co., Inc. v. Koenig,* 21 S.W.3d 142, 146 (Mo.App.

E.D.2000). "Provisions of the *entire legislative act* must be construed together and, if reasonably possible, all provisions must be harmonized." *Id.* Emphasis added. "Statutes should be construed in such a way as to avoid unreasonable, oppressive or absurd results." *Id.*

■■■ An examination of Section 407.825.1 as a whole indicates that the purpose of the statute is the protection of franchisees from the "unlawful" practices of franchisors with respect to franchises in the possession of franchisees. The remaining subsections of 407.825.1 make it unlawful for a franchisor to: (2) coerce a franchisee to accept delivery of specified commodities that the franchisee has not ordered; (3) refuse to deliver such motor vehicles which are ordered by a franchisee and are publicly advertised; (4) coerce a franchisee into an agreement with said franchisor; (5) terminate, cancel or refuse to continue any franchise unless a franchisee substantially defaults in performance of its lawful obligations; (6) to prevent by contract or otherwise a franchisee from changing its capital structure through which it finances its operations; (7) prevent the sale or transfer of a franchisee's franchise; (8) prevent a franchisee from changing its executive management; (9) impose unreasonable standards of performance upon a franchisee; (10) require a franchisee to assent to a release or waiver of estoppel; (11) prohibit the right of free association among franchisees; (12) provide any condition directly in violation of sections 407.810 to 407.835; (13) cancel or refuse to continue a franchise and fail to pay a franchisee reasonable compensation; (14) prevent or refuse to honor succession to a franchise by any legal heir or devisee through will or other written instrument; (15) coerce, threaten, intimidate a franchisee under any condition affecting or related to a franchise agreement; and (16)

initiate any act "enumerated in this subsection on grounds that it has advised a franchisee of its intention to discontinue representation at the time of a franchisee change or require any franchisee to enter into a site control agreement as a condition to initiating any act enumerated in this subsection." None of the preceding subsections indicates concern for the protection of a franchisee with respect to a franchise not yet owned by said franchisee.

In addition, subsection (7)(b), which makes it unlawful for a franchisor to prevent a franchisee's sale of its franchise, provides:

> The franchisee and the *prospective franchisee* shall cooperate fully with the franchisor in providing information relating to the prospective transferee's qualifications, capitalization, integrity and character.

The use of the specific term "prospective franchisee" further evidences that the statute as a whole is not intended to apply to "prospective franchisees," and that where the statute does apply to "prospective franchisees," it uses the specific term.

Plaintiff argues that its status as a Buick franchisee confers standing to sue under the MVFPA because of Section 407.835. Section 407.835 provides:

> Any motor vehicle franchisee may bring an action in any court of competent jurisdiction against a motor vehicle franchisor with whom the franchisee has a franchise, for an act or omission which constitutes an unlawful practice....

This section grants remedies for violations of Section 407.825. As discussed, plaintiff was not a Pontiac franchisee during the time period involved.

We conclude that except where specifically indicated, Section 407.825 applies to franchisor-franchisee relations with respect to franchises granted by franchisors to franchisees and in the possession of franchisees at the time of alleged violations. We decline to broaden the application of the MVFPA beyond that intended by our legislature. Point denied.

Judgment affirmed.

JAMES R. DOWD, C.J. and SHERRI B. SULLIVAN, J., concur.